SILENT HOIST & CRANE CO., INC., A CORPORATION OF THE
STATE OF NEW YORK, PLAINTIFF-RESPONDENT, v.
DIRECTOR, DIVISION OF TAXATION, DEFENDANT-APPELLANT.

Argued January 8, 1985—Decided June 26, 1985.

2

*Mary R. Hamill,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Daniel E. Horgan* argued the cause for respondent (*Walters, McPherson, McNeill,* attorneys; *Kenneth D. McPherson, Jr.* on the briefs).

*Charles M. Costenbader,* submitted a brief on behalf of *amicus curiae* American Home Products Corporation (*Stryker, Tams & Dill,* attorneys; *Charles H. Friedrich,* on the brief).

*Paul H. Frankel* submitted a brief on behalf of *amicus curiae* Committee on State Taxation of the Council of State Chambers of Commerce.

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the validity of a franchise tax assessment against a New York corporation doing business in New Jersey. The taxpayer challenged the inclusion, as part of the value of its franchise, of allocated portions of (1) income derived from investment of corporate funds, and (2) certain machinery sales in New Jersey and elsewhere. We agree with the Director of the Division of Taxation that the taxpayer conducts its business as a "unitary business" and consequently we hold that the assessment reflects the value of the franchise fairly apportioned to New Jersey and thus does not offend the Due Process or Commerce Clauses of the United States Constitution. Accordingly, we reverse the judgment below that disallows the assessment.

## I.

### *State Taxation of Interstate Business*

For over sixty years it has been a settled principle of federalism that a state tax on corporations doing business within a state is not limited to transactions within that state so long as the tax is fairly apportioned. *Underwood Typewriter Co. v. Chamberlain*, 254 *U.S.* 113, 41 *S.Ct.* 45, 65 *L.Ed.* 165 (1920). That case, like this one, involved the manufacture of products in one state and their sale in another. Connecticut used a single-factor formula to allocate Underwood's income from typewriter sales based on property located in Connecticut. Underwood contended that the formula taxes "income arising from business conducted beyond the boundaries of the state," in violation of the Due Process Clause. *Id.* at 120, 41 *S.Ct.* at 46, 65 *L.Ed.* at 169. Justice Brandeis rejected the claim, stating that Connecticut "adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the state," *id.* at 121, 41 *S.Ct.* at 47, 65 *L.Ed.* at 169, and held that the taxpayer had failed to carry its burden of proving that "the method of

apportionment adopted by the state was inherently arbitrary, or that its application to this corporation produced an unreasonable result." *Id.* at 121, 41 *S.Ct.* at 47, 65 *L.Ed.* at 169–70 (footnotes omitted).

■ This underlying principle has continually informed the Supreme Court's treatment of state taxation of businesses that gain income from more than one state. A state is not constitutionally limited to taxing only that slice of an interstate enterprise operating physically within the state. *See, e.g., Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell,* 283 *U.S.* 123, 51 *S.Ct.* 385, 75 *L.Ed.* 879 (1931); *Bass, Ratcliff & Gretton, Ltd. v. State Tax Comm'n,* 266 *U.S.* 271, 45 *S.Ct.* 82, 69 *L.Ed.* 282 (1924); *Underwood Typewriter Co., supra,* 254 *U.S.* 113, 41 *S.Ct.* 45, 65 *L.Ed.* 165. In a long series of decisions the Court has also discarded the formalisms that had obscured its analysis. Thus, in *Northwestern States Portland Cement Co. v. Minnesota,* 358 *U.S.* 450, 79 *S.Ct.* 357, 3 *L.Ed.*2d 421 (1959), the Court held that the Constitution did not bar, as a direct tax on interstate commerce, states from taxing, on an apportioned basis, the net income of foreign corporations that sold their products solely in interstate commerce. *Id.* at 461–62, 79 *S.Ct.* at 363–364, 3 *L.Ed.*2d at 429–30. Finally, in *Complete Auto Transit, Inc. v. Brady,* 430 *U.S.* 274, 97 *S.Ct.* 1076, 51 *L.Ed.*2d 326 (1977), the Court abandoned altogether " 'the use of magic words or labels' " that "could 'disable an otherwise constitutional levy'," and "recognized that the rule against taxing the 'privilege' of doing interstate business" no longer served an analytic function. *Id.* at 284, 97 *S.Ct.* at 1081, 51 *L.Ed.*2d at 334 (quoting *Railway Express Agency v. Virginia,* 358 *U.S.* 434, 441, 79 *S.Ct.* 411, 416, 3 *L.Ed.*2d 450, 456 (1959)). Because "[t]he Court long since had recognized that interstate commerce may be made to pay its way," *Complete Auto Transit, supra,* 430 *U.S.* at 284, 97 *S.Ct.* at 1082, 51 *L.Ed.*2d at 334, the Court shifted the focus of analysis to "the question whether the tax produces a forbidden effect." *Id.* at 288, 79 *S.Ct.* at 1084, 51 *L.Ed.*2d at 337.

Having replaced formalisms with economic reality, the Court developed a simpler, more straightforward approach based on the analysis of the effects of a tax, and will sustain a tax against a Commerce Clause challenge

when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State. [*Id.* at 279, 79 *S.Ct.* at 1079, 51 *L.Ed.*2d at 331.]

The Court has used this test interchangeably to test Due Process challenges to state taxation as well. *See, e.g., ASARCO, Inc. v. Idaho State Tax Comm'n*, 458 *U.S.* 307, 316–19, 102 *S.Ct.* 3103, 3108–3111, 73 *L.Ed.*2d 787, 795–96 (1982).

In its most recent pronouncement, *Container Corp. of America v. Franchise Tax Bd.*, 463 *U.S.* 159, 103 *S.Ct.* 2933, 77 *L.Ed.*2d 545 (1983), the Court combined its analysis of both Due Process and Commerce Clause challenges. The Court reviewed and summarized its development of the law. Beginning with the premise that Justice Brandeis made in *Underwood* that a state may not "tax value earned outside its borders," *Container, supra*, 463 *U.S.* at 164, 103 *S.Ct.* at 2939, 77 *L.Ed.*2d at 552, the Court explained that formal and transactional accounting, limiting values to one situs, does not reflect economic reality. The problem it sees "is that formal accounting is subject to manipulation and imprecision, and often ignores or captures inadequately the many subtle and largely unquantifiable transfers of value that take place among the components of a single enterprise. *See generally Mobil Oil Corp.*, 445 *U.S.* at 438–439, 100 *S.Ct.* 1223 at 1232, 63 *L.Ed.*2d 510, and sources cited." *Id.* at 164, 100 *S.Ct.* at 2940, 77 *L.Ed.*2d at 553. These transfers of value had long been measured in the case of interstate business such as railroads, utilities or freight lines by the "unit rule." J. Hellerstein, "State Taxation Under the Commerce Clause: The History Revisited," *The State Corporation Income Tax, Issues in Worldwide Unitary Combination* 53, 65 (C. McClure, Jr. ed. 1984). Thus, a share of the value of railroad rolling stock could be apportioned to a state on the basis of track mileage there. Such an enterprise connected

physically and by "unit[y] of use and management" possessed an instate value "in combination and from use in connection with the property and capital elsewhere" in excess of the bare value of the track or line. *Adams Express Co. v. Ohio State Auditor*, 165 *U.S.* 194, 222, 41 *L.Ed.* 683, 695 (1897).

In keeping with the premise of such measures, the Court has recognized the unitary business/formula apportionment method as an acceptable approach to the problem of taxing businesses operating in more than one jurisdiction.

> It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction. [*Container, supra,* 463 *U.S.* at 165, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 553.]

In general, the formula determines a taxpayer's income tax base within a particular state by the average ratio of:

$$\frac{\text{Receipts in state}}{\text{Receipts everywhere}} + \frac{\text{Property in state}}{\text{Property everywhere}} + \frac{\text{Payroll in state}}{\text{Payroll everywhere.}}$$

That ratio applied to the taxpayer's total taxable income from all sources, yields the income attributable to the state.

This method has now gained wide acceptance, and is, in one of its forms, the basis for the division of income for state taxation of interstate commerce in forty-five states. *See Report of General Accounting Office*, "Key Issues Affecting State Taxation of Multijurisdictional Corporate Income Need Resolving," (July 1, 1982) (The Comptroller General). The method is the "benchmark against which other apportionment formulas are judged." *Container, supra,* 463 *U.S.* at 170, 103 *S.Ct.* at 2943, 77 *L.Ed.*2d at 556.

We therefore must set forth with precision the only restraints that the Supreme Court has imposed upon a state

employing the unitary business/formula apportionment method of taxation of interstate businesses.

> The Due Process and Commerce Clauses of the Constitution do not allow a State to tax income arising out of interstate activities—even on a proportional basis—unless there is a " 'minimal connection' or 'nexus' between the interstate activities and the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.' " *Exxon Corporation v. Wisconsin Dept. of Revenue*, 447 US, at 219–220, 65 L Ed 2d 66, 100 S Ct 2109, quoting *Mobil Oil Corp. v. Commissioner of Taxes*, 445 US, at 436, 437, 63 L Ed 2d 510, 100 S Ct 1223. [*Id.* at 165, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 553.]

## A.

### *Finding the "Nexus" or "Minimal Connection"*

■ In the classic context, let us say, of an oil company, refining its product in New Jersey and selling it in Pennsylvania, there is little difficulty in finding the "nexus." But in the more complex business organizations of today that may engage in multiple lines of endeavor, as, for example, an oil company that also sells office products and motion pictures, finding the nexus is less clear. But one thing remains constant. If the business is unitary, the taxing authority is not constitutionally required to unravel the conglomerate structure. All that the Constitution requires is:

> (1) that a State not tax a purported "unitary business" unless at least some part of it is conducted in the State * * *;
>
> (2) that there be some bond of ownership or control uniting the purported "unitary business;" [and]
>
> (3) that the out-of-State activities of the purported "unitary business" be related in some concrete way to the in-State activities * * *.
>
> (The functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation—which renders formula apportionment a reasonable method of taxation.) [*Container, supra*, 463 *U.S.* at 165, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 553–54 (emphasis, numeration and parentheses added).]

In the highly complex series of cases that preceded *Container*, dealing largely with taxation of income from worldwide operations of overseas subsidiaries of corporations doing some instate business, the Court disagreed on the application of the

principles that determine whether a "unitary business" has been found. *See, e.g., ASARCO, supra,* 458 *U.S.* 307, 102 *S.Ct.* 3103, 73 *L.Ed.*2d 787; *F.W. Woolworth Co. v. Taxation and Revenue Dep't of New Mexico,* 458 *U.S.* 354, 102 *S.Ct.* 3128, 73 *L.Ed.*2d 819 (1982); *Exxon Corp. v. Wisconsin Dep't of Revenue,* 447 *U.S.* 207, 100 *S.Ct.* 2109, 65 *L.Ed.*2d 66 (1980).

■ Notwithstanding repeated invitations, Congress, with the one exception of the Interstate Income Act, *Pub.L.No.* 86–272, has declined to step in to resolve the problems of federalism under its Commerce Clause powers.[1] In *Container,*

---

[1]In response to *Portland Cement Co., supra,* 358 *U.S.* 450, 79 *S.Ct.* 357, 3 *L.Ed.* 2d 421, Congress enacted Public Law No. 86–272, establishing minimum jurisdictional requirements for a state to impose a net income tax on nondomiciliary corporations' income derived from interstate commerce. The law prohibits states from taxing income of out-of-state sellers of tangible personal property if their sole instate activity consists of soliciting orders to be approved outside the state and filled by delivery from a location outside the state.

At about the same time, the states were themselves taking steps to modify their existing tax apportionment schemes. In the late 1950's, representatives from the states met to discuss a uniform system and, in 1957, the Uniform Division of Income for Tax Purposes Act (UDITPA), 7A *U.L.A.* 91 (1978), was adopted by the Commissioners on Uniform State Laws and the American Bar Association. It was designed as a model act to aid states in enforcing taxpayer compliance and eliminating the possibility of double taxation of interstate businesses. UDITPA divides corporate income into nonbusiness income, for which specific allocation is permitted, and business income, for which an apportionment formula is used. For business income, UDITPA offers the traditional apportionment formula based on three factors: payroll, sales, and property.

In 1964, a congressional subcommittee published what is known as the Willis Report, a study on state taxation of interstate business. *See* "State Taxation of Interstate Commerce," *H.R.Rep. No. 1480* (88th Cong., 2d Sess., 1964). The Report criticized the diversity in state apportionment formulas and recommended a federal allocation plan using a two-factor (property and payroll) formula. The Report prodded the states to police themselves.

The product of the states' initiative was the Multistate Tax Compact. The constitutionality of the Tax Compact was upheld in *United States Steel Corp. v. Multistate Tax Comm'n,* 434 *U.S.* 452, 98 *S.Ct.* 799, 54 *L.Ed.*2d 682 (1978).

Some twenty-three states, plus the District of Columbia, have adopted the Tax Compact. Despite the Compact's goal of achieving some degree of national uniformity, however, diverse state apportionment methods abound even after

*supra*, the Court appeared resolved to take itself out of the business of being a tax commission and made it clear that the taxpayer has the "distinct burden of showing by 'clear and cogent evidence' that [the state tax] results in extraterritorial values being taxed . . . .," 463 *U.S.* at 164, 103 *S.Ct.* at 2939, 77 *L.Ed.*2d at 552 (quoting *Exxon Corp., supra,* 447 *U.S.* at 221, 100 *S.Ct.* at 2119, 65 *L.Ed.*2d at 80), and that the only restraints that it will impose are "to determine whether the state court applied the correct standards to the case; and if it did, whether its judgment was 'within the realm of a permissible judgment'." 463 *U.S.* at 176, 103 *S.Ct.* at 2946, 77 *L.Ed.*2d at 560.

## B.

### *Finding the Rational Relationship*

This issue will frequently present a difficult issue for disposition. Basically, if there is a nexus, this part of the due process test comes down to the fairness of the apportionment: "whether the state apportionment formula is doing the job it was developed to do." Note, "The Unitary Tax Method," 15 *Pac. L.J.* 109, 135 (1983). In each case the resulting tax liability must not be "out of all appropriate proportion to the business transacted" in the taxing state itself. *Hans Rees', supra,* 283 *U.S.* at 135, 51 *S.Ct.* at 389, 75 *L.Ed.* at 908 (attributing 80% of income to North Carolina when only 17% warranted). Such cases frequently raise concern for double taxation when differing states use differing formulas. *See Moorman Mfg. Co. v. Bair,* 437 *U.S.* 267, 98 *S.Ct.* 2340, 57 *L.Ed.*2d 197 (1978) (taxpayer failing to meet burden of proving Iowa's single factor apportionment formula, based solely on sales, produced unreasonable results).

---

the promulgation of this uniform act. New Jersey has never joined the Compact. For detailed history from which this recital is drawn, *see* K. Bakewell, "State Tax Apportionment", 48 *Mo.L.Rev.* 719 (1983).

It should be noted that the taxpayers do not contend that the tax here is discriminatory against interstate businesses or that it is an undue burden on interstate commerce. They did not challenge the allocation formulas as being unfair as applied to an interstate business like their own, and they do not suggest that the result of the New Jersey tax is multiple taxation elsewhere. Indeed, they do not at all attack the amount of taxes determined by the Director, choosing to rely solely upon their unitary business arguments. We must therefore analyze the New Jersey tax at issue and consider whether the taxpayer has presented clear and cogent evidence that the items of income and receipts were not part of its "unitary business," and that application of the tax results in "extraterritorial values being taxed."

## II.

### The State Tax

The Corporation Business Tax Act, *N.J.S.A.* 54:10A–1 to –40, enacted in 1945, requires that a corporation shall pay an annual franchise tax (Corporation Business Tax or CBT) "for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State." *N.J.S.A.* 54:10A–2.

The history of the act has been detailed in this Court's earlier decisions. *See Roadway Express, Inc. et al. v. Director, Div. of Taxation,* 50 *N.J.* 471 (1967); *United States Steel Corp. v. Director, Div. of Taxation,* 38 *N.J.* 533 (1962). It will suffice to summarize that history. Originally enacted to replace the "tax lightning" inflicted by local levies on intangible property, the 1945 tax was limited to the "net worth" of the corpora-

tions.[2]  The net income measure of the tax, as another element in addition to net worth, was inserted by *L.* 1958, *c.* 63.  In essence, the latter is a corporate income tax, although at the time denominated a franchise tax due to a surmised "historical antipathy in New Jersey to an income tax as such."  *Roadway Express, supra,* 50 *N.J.* at 485.

For corporations that maintain a regular place of business outside of New Jersey, the act recognizes that only a percentage of the taxpayer's net worth and net income may be the result of its activities in the state.  Consequently, an "allocation formula" is applied to both the net worth and net income tax bases so that only those portions of entire net worth and entire net income, respectively, that are fairly attributable to the corporation's activities in New Jersey, are used in the measure of the tax.  *See N.J.S.A.* 54:10A–6.  The allocation formula consists of three factors, namely, property, payroll and receipts. Each of the three factors in the so-called three-ply formula is expressed as a fraction, the numerator of which is, respectively, the taxpayer's New Jersey property, receipt, and payroll;  and the denominator of which is the taxpayer's total property, receipts, and payroll generated by the operations of the entire corporation.  *N.J.S.A.* 54:10A–6(B).  These fractions are averaged, and the combined fraction (referred to in New Jersey as the allocation factor) is then applied to the taxpayer's entire net worth and entire net income in order to determine the percentage or portion of net worth and income properly attributable, and thus, taxable to New Jersey.  *See Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313 (1984).

---

[2]*See Fedders Fin. Corp. v. Director, Div. of Taxation,* 96 *N.J.* 376 (1984), for the meaning of "net worth."  The Legislature has since passed a phased out repeal of the "net worth" provisions of the act.  *L.* 1982, c. 55.

This appeal focuses upon the net income tax base.[3] New Jersey defines the taxpayer's "entire net income" in terms of its federal "taxable income," with certain exceptions to be noted. *N.J.S.A.* 54:10A-4(k). To this base, New Jersey applies its tax. An example will illustrate the tax's effect. Assume that a Pennsylvania manufacturing corporation, subject to the CBT, markets its products in New Jersey and New York; that its property is only in Pennsylvania; that its receipts are equal in the three states; and that its payroll is 50% in Pennsylvania, 25% in New York and 25% in New Jersey. If the company's taxable income were $500,000, the New Jersey CBT on net income would be calculated as follows:

Average Ratio of
Property Receipts Payroll

$$\frac{NJ}{Total} \quad \frac{0}{100} + \frac{33}{100} + \frac{25}{100} = \frac{58}{100} \div 3 = 19.3\% \quad \text{(Allocation Formula)}$$

| (19.3%)<br>Allocation<br>Factor | × | ($500,000)<br>Entire Net<br>Income | × | (9%)<br>Tax<br>Rate | = | $8,685<br>Tax |

The effective tax rate in New Jersey is thus reduced to 1.7% of entire net income by the application of the formula. If each of the other states followed a comparable taxing scheme, the overall tax would be fair and fairly apportioned.

As noted, New Jersey has eschewed joining the Multistate Tax Commission.

New Jersey follows the principle of apportioning all income under its three-factor formula. No provision is made for specifically allocating any income, such as interest, dividends, capital gains, patents and copyrights, rentals,

---

[3]In its petition of appeal to the Tax Court, Silent Hoist also challenged the inclusion of its portfolio income in net worth. Technically, a claim for refund would have to be made since the taxpayer's original return had included it in net worth. The reasons that we furnish for net income taxation would be applicable to net worth analysis. Since that tax has been repealed, we focus the opinion on net income.

income from services, and the like, which is the practice in many States. Under the Uniform Division of Income for Tax Purposes Act (UDITPA), which has been adopted by 24 States and the District of Columbia, this type of income is taken out of the apportionment formula, and is specifically allocated.[4] [*Report of the New Jersey Tax Policy Committee*, Part V, "Non-Property Taxes in a Fair and Equitable Tax System," (February 23, 1972) at 25 (Cahill Commission).]

Careful study has been made of the question whether New Jersey should modify its policy on allocation of income but the New Jersey Tax Policy Committee recommended that the policy of treating all items of income within the apportionment formula be continued. *Id.* at 27. Consequently, we lay great stress upon the broad authority the act gives to the Director to adjust the allocation factor in order to reflect more accurately and fairly "the activity, business, receipts, capital, entire net worth or entire net income of a taxpayer" reasonably referable to the state. *N.J.S.A.* 54:10A–8. *N.J.S.A.* 54:10A–8 authorizes the Director to make specific adjustments: (1) to adhere to those factors already set forth in the statutory formula, namely, property, receipts, and payrolls; (2) to include in the formula one or more other acceptable recognized factors, such as expenses, purchases, or existing contracts; and (3) to exclude one or more assets from the formula or from the entire net worth tax base. In addition to this specific authority, the Director is given broad general discretion to "apply [ ] any other similar or different method calculated to effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to the State." *N.J.S.A.* 54:10A–8(e). *See Metromedia, Inc., supra,* 97 *N.J.* 313.

With this as background, we examine how the Director applied the act to the taxpayer.

---

[4]While not specifically allocating dividends, New Jersey is generous in its treatment of such income. This will be significant in our consideration of the taxpayer's investment income. In New Jersey, only 50% of the dividends received from non-subsidiaries are included in the measure of the net income tax, and dividends from subsidiaries (at least 80% owned) are totally excluded from the tax base. *N.J.S.A.* 54:10A–4(k)(1).

### III.

### *The Taxpayer and Its Operations*

Silent Hoist and Crane Co., Inc. is a New York corporation having its principal place of business and its manufacturing plant in Brooklyn, New York. It owns two parcels of commercial property in New Jersey, one in Clifton and one in Bloomfield. It originally intended to move its plant to Clifton but abandoned the idea. Silent Hoist obtained a certificate of authority and qualified to transact business in New Jersey under *N.J.S.A.* 14A:13–3 during the relevant years. None of its real estate tenants were related to the manufacturing operation. Its sales to customers in New Jersey for the relevant years in comparison to total sales and services as shown on its books of account were:

|            | 1971      | 1972      | 1973      | 1974         |
|------------|-----------|-----------|-----------|--------------|
| New Jersey | 436,566   | 986,862   | 998,740   | 706,410      |
| Total      | 5,104,500 | 5,472,660 | 6,672,307 | 6,111,811 [5] |

When it filed its New Jersey CBT returns for the period, it reported no income from sales but reported only the income and expenses related to its New Jersey real estate operations.[6] Upon audit, the Division of Taxation, noted that the taxpayer had failed to report its "entire net income," equated with taxable income, and consequently increased Silent Hoist's net income to include its sales income and the income from its

---

[5]These figures are not intended to be exact. The income shown is a composite of sales and services. The illustration serves only to demonstrate the approximate relationship of the New Jersey sales to system-wide operations.

[6]The taxpayer included in its entire net worth both its Brooklyn manufacturing plant and the investment securities that are at issue.

investments. (As noted, New Jersey only includes 50% of dividends received from other corporations.) [7]

The taxpayer appealed the assessment to the Tax Court. The trial developed the following facts. Silent Hoist is a privately held corporation. Its president, Eric Wunsch, is its principal manager. He exercises effective control over all areas of the company's operations. Its mode of operation was to seek out potential customers in New Jersey and elsewhere. The company's employees would visit potential customers to survey their needs. They would advise the customer of a possible solution to the material handling problems and suggest the superior quality of the Silent Hoist product. If the customer's interest grew, design conferences would follow either in Brooklyn, New Jersey, or at a location having a similar piece of plaintiff's machinery.

Following the design phase, the machinery would usually be fabricated in Brooklyn or, in some cases, in Connecticut, and be delivered to New Jersey. The company's sales representatives were themselves engineers and would follow up if one of the machines malfunctioned. The representatives would show the customer's personnel how to deal with problems, and on occasion themselves remove pieces of the machine and ship them back to the plant for repairs. The company's service department performed warranty repairs, trained customer personnel, and reviewed technical problems with the customers.

Wunsch described himself as the general manager whose duty it was to keep "the business functioning and working profitably." He supervised and directed all of the company's activities. He made the real estate and investment decisions, and he was involved in the design of the machinery and its sales, advertising and long-range planning.

The taxpayer had one bank account that covered all of its activities. All receipts went into and most expenses were paid

---

[7]The Division made two other adjustments, to show the securities at market value and to correct the allocation factor. Neither is the subject of this appeal.

out of that account. There was a single chart of accounts for the business with no separate accounts for manufacturing, sales, real estate or securities investment.

The central issue before the Tax Court was whether this was a "unitary business." That court believed that existing Supreme Court precedent required that it hold for the taxpayer, that its investment, real estate, and sales businesses were distinct and could not be taxed under a unitary business/formula apportionment system. It entered judgment in favor of the taxpayer. 5 *N.J. Tax* 242 (1983). At the time of the Tax Court decision, *ASARCO* was the last Supreme Court pronouncement. As seen in Part I(A.) hereof, *supra*, (slip op. at 7), the Supreme Court has since modified its holding in *ASARCO*.

The Appellate Division affirmed on the basis of the Tax Court opinion. 6 *N.J. Tax* 348 (1984). We granted the State's petition for certification. 97 *N.J.* 650 (1984).

IV.

A.

*Was Silent Hoist's Portfolio Income Correctly Included in Its Apportioned Income Base?*

The "linchpin of apportionability" is the finding of a "unitary-business." *Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, 445 *U.S.* 425, 439, 100 *S.Ct.* 1223, 1232, 63 *L.Ed.* 2d 510, 522 (1980). If ever there was a unitary enterprise, this appears to be one. The taxpayer has sought to rely upon two 1982 decisions of the Supreme Court: *ASARCO, supra*, 458 *U.S.* 307, 102 *S.Ct.* 3103, 73 *L.Ed.*2d 787; and *Woolworth*, *supra*, 458 *U.S.* 354, 102 *S.Ct.* 3128, 73 *L.Ed.*2d 819. Both of these cases are remote from *Silent Hoist* in terms of the economic transactions. In each case, the primary issue was that the taxing state sought to include in the taxpayer's base the income, not of the taxpayer, but of foreign subsidiaries not doing any business in the taxing state by taxing the dividends

received from the subsidiaries. (*ASARCO* also dealt with income from portfolio investments, to be discussed in fn. 8, *infra,* (at 22)). Here we deal not with consolidated returns, income of subsidiaries or foreign commerce issues. We deal with one entity, Silent Hoist. Concededly, one such entity may not be unitary. But it is a rare case.

The Supreme Court has never adopted a single test for determining what is a unitary business. A commentator has described the Court as "adher[ing] to its catholic approach by stressing a number of factors, many of them familiar" for determining when a business is unitary. W. Hellerstein, "State Income Taxation," 79 *Mich.L.Rev.* 113, 150 (1980). In *Container, supra,* the Court reemphasized that the "final point that needs to be made about the unitary business concept is that it is not, so to speak, unitary." 463 *U.S.* at 167, 103 *S.Ct.* at 2941, 77 *L.Ed.*2d at 554–55. However, under any test that has been approved, the taxpayer meets the measure of a unitary business.

Silent Hoist meets the test, in *Exxon* terms, of enjoying the "benefits from an umbrella of centralized management and controlled interaction." 447 *U.S.* at 224, 100 *S.Ct.* at 2120, 65 *L.Ed.*2d at 81. The interaction between the various aspects of plaintiff's business need not involve measurable flows of cash. Rather, the question is whether there have been "unquantifiable transfers of value * * * among the components of a single enterprise." *Container, supra,* 463 *U.S.* at 164, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 553.

Silent Hoist meets the *Butler Bros.* test of three unities of ownership, operation, and use. Unity of ownership means that the activities outside the tax jurisdiction, together with the in-state activities are owned by the same taxpayer; unity of operation means that there is a centralized executive structure with central purchasing, advertising, accounting and management; and unity of use is found in a centralized executive force and a general system of operations. *See Butler Bros. v.*

*McColgan*, 17 *Cal.*2d 664, 111 *P.*2d 334 (1941), aff'd, 315 *U.S.* 501, 62 *S.Ct.* 701, 86 *L.Ed.* 991 (1942).

Silent Hoist also meets the "dependent upon or contributory" test. *See Ramsay, Scarlett & Co., Inc. v. Comptroller*, 302 *Md.* 825, 490 *A.*2d 1296 (1985) (test not met in circumstances); *F.W. Woolworth Co. v. Director, Div. of Taxation*, 45 *N.J.* 466 (1965); *Crawford Mfg. Co. v. State Comm'n of Revenue and Taxation*, 180 *Kan.* 352, 357, 304 *P.*2d 504, 510 (1956). This concept is closely related to the concept of "mutual benefit." *Western Auto Supply Co. v. Commissioner of Taxation*, 245 *Minn.* 346, 357, 71 *N.W.*2d 797, 805 (1955).

Applying each of the above enumerated tests, and bearing in mind that the taxpayer has the burden of proof, *Mobil, supra*, 445 *U.S.* at 439–40, 100 *S.Ct.* at 1232–1233, 63 *L.Ed.*2d at 522, it is clear from this record that the taxpayer has made no showing that its business falls without the tests. Here, as noted, and as distinct from the Supreme Court cases in which multinational corporations and their subsidiaries were involved, we are discussing only one corporation, Silent Hoist. It is for this reason that the divident payor v. divident recipient test enunciated by the Supreme Court in *Mobil, Exxon, ASARCO, Woolworth* and *Container* and relied upon by Silent Hoist is not applicable. In those cases the question involved, for the most part, dividends paid from major subsidiaries to their parent. The inquiry was whether the parent, the recipient of the dividend income, controlled the subsidiary, the divident payor. The test to be developed here involving one corporation is whether the unities apply within the internal operations of Silent Hoist. The focus must be on Silent Hoist's investment activity and other aspects of its corporate business and the role the investment activity plays in those other activities.

First, the record establishes that all of Silent Hoist's business is controlled by one chief executive officer, Mr. Wunsch, who testified that he made all the major corporate decisions regarding manufacturing, real estate, and investment. What emerges

from the record is a corporation run and controlled by one man. Wunsch managed the company with the assistance of a vice-president in charge of sales and another in charge of engineering. Thus, Wunsch's involvement in the three aspects of the business was evident. On a far less substantial showing of centralized management, the Supreme Court of Montana held in *Russell Stover Candies, Inc. v. Dep't of Revenue,* 665 *P.*2d 198 (Mont.1983) that the taxpayer's in-state cattle ranch divisions and out-of-state paper box divisions formed parts of a unitary business. *See also Commissioner of Revenue v. Associated Dry Goods, Inc.,* 347 *N.W.*2d 36 (Minn.1984), *cert.* den., —— *U.S.* ——, 105 *S.Ct.* 124, 83 *L.Ed.*2d 66 (1984) (separate divisions formed a unitary business where corporation had a single board of directors and a single set of officers and shareholders, administrative services were centralized, and there was a commingling of funds); *ARMCO, Inc. v. Hardesty,* 303 *S.E.*2d 706 (W.Va.1983), rev'd on other grounds, 467 *U.S.* 638, 104 *S.Ct.* 2620, 81 *L.Ed.*2d 540 (1984) (activities of steel group, wire rope group, and metal products division are parts of "unitary business").

Here, the evidence does not establish that any of the alleged operations were conducted as a discrete business enterprise. Clearly, the investment operation was not a discrete business enterprise; it was merely incidental to the company's manufacturing business. Also, the real estate in New Jersey never was a separate and discrete business operation from the investment or manufacturing aspect of the business. The Clifton site was originally purchased by Silent Hoist to be the new location of its manufacturing business which it contemplated moving from New York City. The building was completed in 1971. Wunsch exercised control over the building before it was leased. Moreover, presumably, the funds used to purchase the property were derived from general corporate funds, including the manufacturing business, or from the sale of securities. From Silent Hoist's financial records, it appears that the Bloomfield real estate was not rented during certain of the tax years in

question; thus, presumably, the substantial expenses for that operation were paid out of general corporate funds.

The financial records of the company offer strong evidence that the real estate, investment and manufacturing business were closely integrated and run as a unitary business. There was one bank account for the entire corporation, into which all receipts were deposited and out of which nearly all expenses were paid. There was a direct monetary flow of value from one segment of the business to another.

The source of funds and application of funds also establish the integration of the business. From the financial records, it appears that the proceeds of securities liquidated, added to the corporation's single bank account, were used as working capital in the manufacturing aspect of the business and to buy New Jersey property and presumably to service the debt on it; and that the corporation's centralized administrative services, included the preparation of tax returns and financial statements for the real estate business. Furthermore, in filing its New York Corporation Franchise Tax Return on a unitary basis, Silent Hoist made use of its New Jersey real estate depreciation allowance and losses to offset its manufacturing and investment income. The real estate depreciation provided substantial cash flow benefits for the entire business.

We agree with Silent Hoist that a corporation will not be deemed a unitary corporation merely because the income from a subsidiary or a division adds to the richness of the corporation, or that the occasional oversight with respect to capital structure, debt and dividends that a parent gives a subsidiary is enough to establish a unity relationship, or that the single set of accounting records of the corporation will be sufficient to establish a unitary business. We do not hold that any of these factors alone would be sufficient to find that Silent Hoist is a unitary corporation. Rather, we hold that it is the combination of these factors which leads indisputably to the conclusion that Silent Hoist is a unitary corporation.

New Jersey, like the United States Supreme Court, has been eclectic in its approach to the several tests for finding a unitary business. *See Woolworth, supra,* 45 *N.J.* 466. What we focus on here, as did the *Woolworth* Court, is economic reality. All that the Supreme Court asks is that we assure ourselves that there be "some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation." *Container, supra,* 463 *U.S.* at 166, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 554.

As we have seen, Silent Hoist's investment capital was capable of being pledged, liquidated or converted to other uses of the company's sales or real estate operations. To describe this economic power as passive does not reflect economic reality.

The taxpayer would have us divide this investment income from the organic whole of the business enterprise. This is, however, not a matter of constitutional law, but a matter of tax preference. Our job is not to rewrite the State's Corporation Business Tax but to apply it as intended. New Jersey's tax policy is quite distinct from the majority of states. We do not seek to allocate non-business income to the place of commercial or legal domicile. On the other hand, we accommodate our tax policy to the modern business complex by specifically excluding all dividends from subsidiaries (at least 80% owned) and 50% of other dividend income.[8]

---

[8]Indeed, had the *ASARCO* facts arisen in New Jersey, the issues would not have been the same because New Jersey automatically excludes 50% of dividend income, and does not employ combined or consolidated accounting. In *ASARCO,* Justice Powell took pains in a footnote to explain that investment income may be taxed by non-domiciliary states. *See* 458 *U.S.* at 328 n. 22, 102 *S.Ct.* at 3114 n. 22, 73 *L.Ed.*2d at 802 n. 22. *ASARCO* can only be understood by recognizing what the taxing state was trying to do. Idaho wanted to have it both ways; it wanted to include the subsidiaries' income in the Idaho income base, but refused to include the property, payroll and receipts of the subsidiaries in the denominator of its formula. The result was a severe distortion. Commentators have recognized that this tortuous distinction led to an indefensible position of advocacy that foreclosed its case. *See, e.g.,* C. Floyd, "The

We are more than satisfied here that there was a distinct sharing of the value of common management, accounting and operations that takes the portfolio income of this taxpayer well within the concept of a unitary business.

## B.

### *Was Silent Hoist's sales income correctly included in its tax base?*

■ The same reasons that impel us to find the taxpayer's portfolio income part of its unitary business apply with equal force to its sales income. Its New Jersey sales were more than $3,000,000, or almost 13% of system sales of $23,361,278. *See supra* (at 15). As such, they contributed significantly to the enhanced value of the unitary business. These sales were a

'Unitary' Business in State Taxation: Confusion at the Supreme Court?" 1982 *B.Y.U.L.Rev.* 465 (1982). The Supreme Court, in the commentator's opinion, was led to confuse the issues of apportionment of "business income" under UDITPA with the links necessary to justify imposition of a state tax on a unitary business. Floyd, *supra*, 1982 *B.Y.U.L.Rev.* at 481. By emphasizing that the five dividend-paying companies were not part of ASARCO's unitary business, Idaho "no doubt intended to lay the foundation for a holding that no adjustment of the factors of apportionment was necessary * * *." *Id.* at 501. The gamble was fatal to Idaho's position and gave ASARCO the victory that Mobil lost because it had failed to timely raise the question of apportionment. *See Mobil, supra,* 445 *U.S.* 425, 100 *S.Ct.* 1223, 63 *L.Ed.*2d 510. It was this distortion that led to Justice Stevens' dissent in *Mobil.* He recognized the constitutional power of states to tax all income of a unitary business, including investment income, provided that the formula for including all such combined and subsidiary income was fair. 445 *U.S.* at 449–50, 100 *S.Ct.* at 1237–1238, 63 *L.Ed.*2d at 529.

New Jersey's tax scheme as applied to Silent Hoist falls convincingly short of any such distortion. We place great emphasis upon the fact that the receipts fraction must be determined in harmony with the definition of entire net income. "To put it differently, the tax base and the receipts fraction are symmetrical. That which is excluded from the former is excluded from the latter and, conversely, that which is included in the former is also included in the latter." *American Tel. & Tel. v. Taxation Div. Director,* 4 *N.J.Tax* 638, 648 (1982). Thus, our elimination of 80% owned subsidiary income and 50% of all dividend income serves to harmonize the fractions.

significant source of the funds that enabled the taxpayer to acquire its property in New Jersey.

We perceive the same factors at work as in the case of the portfolio income. The centralized one-man management team that coordinated the real estate operations in New Jersey, as well as the portfolio investments, oversaw the sales operation. Depreciation from the New Jersey operation played a role in the tax returns of sales activities. We find that there were transfers of value among the components of the enterprise, an umbrella of centralized management and controlled interaction, and a dependence and contribution among the operations creating a mutual benefit that each shared.

Moreover, even were Silent Hoist's sales not considered part of its unitary business, there would be little doubt that there is an otherwise sufficient "minimal connection" with the state that warrants the assessment. *See Tamko Asphalt Products, Inc. v. Taxation Div. Director*, 5 *N.J. Tax* 446 (1983), aff'd, 6 *N.J. Tax* 342 (App.Div.1984). In that case a Maryland asphalt roofing supplier contested a CBT assessment. Tamko did not advertise in New Jersey, had no bank account, inventory, plant or telephone listing and no identifiable office. Yet, the Tax Court found that its marketing activities in New Jersey distinctly exceeded the bare "solicitation of orders" for which "the Interstate Income Act, *Pub.L.No.* 86–272, prohibits imposition of a state tax measured by income on corporations engaged only in the solicitation of orders within the taxing state." 5 *N.J. Tax* at 456. The court explained that Tamko's sales representatives, one of whom lived in New Jersey, not only solicited orders but "also promote[d] Tamko products and service customer accounts by investigating, reporting and adjusting customer complaints." *Id.* It found Tamko to be subject to tax in New Jersey. *Id.* at 453–54. In view of the disposition that we make of the unitary business issue, we need not base our decision on these contacts although we note their similarity. Hence, because the sales income of Silent Hoist is part of its unitary business conducted in New Jersey through its real

estate ventures, that sales income, fairly apportioned, is part of the taxpayer's entire net income.

## V.

The Court, having concluded that there is an adequate "nexus or minimal connection" between the State and items of income, the only question remaining is whether the tax has been "fairly apportioned." *Container, supra,* 463 *U.S.* at 171, 103 *S.Ct.* at 2943, 77 *L.Ed.*2d at 557. Although it was not the basis of its decision, the Tax Court concluded that the Director had erred in holding that he was without discretion to review bookkeeping or accounting records of the corporation to determine if, in fact, the allocation formula was unfair or unreasonable. Instead the Director reviewed only the tax returns and subsequent correspondence between the parties. The Tax Court concluded this to be an insufficient basis for the denial. As noted, before us, the taxpayer did not contest, on a statutory basis, the fairness of the allocation formula as applied to its circumstances. It chose to rely entirely upon its constitutional argument that the Tax Court sustained.

Nonetheless, indulgence of this opportunity is appropriate in this case because when the case was before the Tax Court, the parties would have approached the matter in light of the recent decisions in *ASARCO* and *Woolworth.*[9] Those decisions reflected an attitude of judicial vigilance and "at least by implication cast doubt on the power of a state to include in a nondomiciliary payee's apportionable tax base any income from intangibles received from an out-of-state payor with which the payee is not conducting a unitary business." W. Hellerstein, "State Income Taxation of Multijurisdictional Corporations, Part II: Reflections on *ASARCO* and *Woolworth*," 81 *Mich.L.Rev.* 157, 178–79 (1982). Only the cautious would have observed that it

---

[9]*ASARCO* and *Woolworth* were decided on June 29, 1982. The Tax Court decision was decided on January 28, 1983. *Container* was decided on June 27, 1983.

was "not, however, the only reading it may be given, a fact that may render the preceding discussion more than academic." *Id.* at 182.

The discussion became academic when

> in *Container Corp. of America v. Franchise Tax Board,* the Supreme Court significantly enhanced the states' power to tax income of domestic corporations' foreign subsidiaries. Using broad language that suggested a desire to place severe limits on future challenges to state corporate income tax schemes, the Court reversed the thrust of decisions from the previous Term. [Note, "The Supreme Court 1982 Term," 97 *Harv.L.Rev.* 70, 112 (1983) (footnotes omitted).]

The *Container* decision "implies that the Court's holdings in *Woolworth* and *ASARCO* can be confined to their specific facts." Note, "State Taxation of Multinationals and the Unitary Business Concept: A Contemporary View," 10 *Brooklyn J. of Int'l Law* 115, 145 (1984). Putting it plainly, Professor Hellerstein predicted that perhaps the most that could be drawn from *ASARCO* and *Woolworth* was that whatever broad principles may have been stated, "the unitary business in the end may simply be something that the Court knows when it sees it." Hellerstein, *supra,* 81 *Mich.L.Rev.* at 183–84.

We sincerely doubt that the Supreme Court would not know that Silent Hoist's business was unitary when it saw the facts before us. We are satisfied that the sales and investment income of Silent Hoist is subject to a fairly apportioned income tax in New Jersey.

■ We have always placed great reliance on the discretion of the Director to adjust the factors to compensate for any unfairness in their application. *Woolworth, supra,* 45 *N.J.* at 494–95. While we are not persuaded that the assessment will be shown to be "out of all appropriate proportion," *Hans Rees', supra,* 283 *U.S.* at 135, 51 *S.Ct.* at 389, 75 *L.Ed.* at 908, the taxpayer should be allowed the opportunity to be heard on the question whether the formula as applied produces such results with respect to its activities in New Jersey.

The judgment of the Appellate Division is reversed and the cause remanded to the Tax Court to test the claim of proportionality.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For affirmance*—None.