UNITED STATES STEEL CORPORATION, APPELLANT, v. DIRECTOR, DIVISION OF TAXATION, RESPONDENT.

Argued March 20, 1962—Reargued September 25, 1962—
Decided December 3, 1962.

534

Mr. *Josiah Stryker,* for the appellant, on the first argument; Mr. *Arthur C. Dwyer,* on reargument (*Messrs. Stryker, Tams & Dill,* attorneys; Mr. *W. L. Hearne* and Mr. *Arthur E. Hauser,* of the New York Bar, of counsel).

Mr. *Alan B. Handler,* Deputy Attorney General, argued the cause for respondent (Mr. *Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J.   Here involved are deficiency assessments levied under the Corporation Business Tax Act (1945) (*L.* 1945, *c.* 162; *N. J. S. A.* 54:10A–1 *et seq.*).   One relates

to United States Steel Company (herein Steel Company) for the calendar year 1952, and the other to United States Steel Corporation (herein Steel Corporation) for the calendar year 1953. Both are domestic corporations. The Division of Tax Appeals sustained the assessments. We certified the ensuing appeals before the Appellate Division acted upon them.

The Corporation Business Tax Act (1945) was amended quite extensively by *L.* 1958, *c.* 63. We are concerned with the statute as it existed in 1952 and 1953. Hence our references will be directly to the 1945 act and pertinent amendments of it.

The case revolves about corporate mergers which followed a decision by Steel Corporation to take over the operations of its subsidiaries. The first step was a merger as of the end of 1951 of 18 subsidiaries into Steel Company, also a subsidiary. The second step, as of the end of 1952, was a merger of Steel Company into Steel Corporation.

For the years here involved, the Corporation Business Tax Act (1945) provided for a franchise tax for each privilege year "measured by the taxpayer's net worth as of the close of the calendar year or of its fiscal year next preceding the privilege year" (§ 15).

Hence the tax upon Steel Company for the privilege year 1952 was based upon its net worth as of December 31, 1951, the last day of the base year. It was sometime on that day that the agreements for merger into Steel Company were filed with the Secretary of State. The Director contends it was upon such filing that the merger agreements became the "act of merger" under our corporation law, *R. S.* 14:12–3.

Although seven of the subsidiaries thereby merged into Steel Company had been incorporated or authorized to do business in New Jersey, no returns were filed for them for the privilege year 1952, the parent, Steel Corporation, taking the position that they expired at some moment before the beginning of 1952. On the other hand, Steel Company's return for the privilege year 1952 did not reflect the additional net worth resulting from the mergers, and this upon

the thesis that the mergers had not occurred in the base year 1951.

The Director of Taxation held the mergers had to occur either in 1951 or 1952, and the parent company having denied the mergers occurred in 1952 as evidenced by the failure to file on behalf of the seven subsidiaries for 1952, the Director deemed the mergers to have occurred on December 31, 1951, as the underlying events themselves revealed. Accordingly he redetermined the net worth of Steel Company for 1952 on the postmerger basis.

With respect to the final step, the merger of Steel Company into Steel Corporation, the certificate of ownership and copy of the resolution to merge bore the stamp of the Secretary of State showing filing on "Dec. 31, 1952," with a notation in ink "12 P. M." The Director contends the merger became effective upon such filing under our corporation law, *N. J. S. A.* 14:12–10.

Upon the thesis that Steel Company was nonexistent at any time in 1953, no report was filed for it for 1953. On the other hand, Steel Corporation filed for 1953 on a premerger basis, the thesis being that the merger had not occurred in 1952. The Director, again accepting the decision of Steel Corporation that Steel Company was nonexistent on January 1, 1953, made the deficiency assessment against Steel Corporation on the basis of the postmerger net worth, *i. e.,* on the premise that it absorbed Steel Company on December 31, 1952.

I.

The taxpayer asks us to hold that mergers may be accomplished at a moment which is neither a part of one year nor a part of the ensuing year, urging that business utility demands that result. It refers to monumental problems which would confront corporations so situated if mergers must become effective on either December 31 or January 1. The showing is impressive. Indeed, we may assume that a merger may be made effective precisely at year-end for sun-

dry purposes. But the issue before us is whether that proposition can be accepted for the purposes of the tax statute in question. We think it cannot, for reasons we shall presently state.

■ And we add that the solution of the problem is not advanced by the rule that for the purpose of the computation of time, the day of the initiating event is excluded. *State v. Rhodes,* 11 *N. J.* 515, 522 (1953); *McCulloch v. Hopper,* 47 *N. J. L.* 189 (*Sup. Ct.* 1885). That rule was devised for its utility in fixing the outer limit of the period in which a response must be made to the initiating event. It quite obviously is of no help in determining the day upon which a given event in fact occurred. For example, if a tender had to be made upon a specific day, it would hardly do to say a tender in fact made on that day was too late because the law ignores the day upon which the event occurred. Indeed, the taxpayers do not ask that we conclude the mergers occurred on January 1. Rather they ask that we find the mergers occurred on neither of those days. That result cannot be reached upon any rule for the computation of time.

And with respect to the merger of Steel Company into Steel Corporation, the notation made by the Secretary of State is of no probative force. We are not sure that we understand what is meant by the combination of "Dec. 31, 1952" and "12 P. M." We cannot discern an interval of time which is not a part of some day. As a matter of *fact,* the filing had to occur on December 31 or January 1.

The true question remains whether we should recognize a right to accomplish a merger without tax consequences under the statute here involved. And if the answer is no, then upon the record the only possible finding is that the mergers occurred on December 31.

■■ A separate question is whether, for the purposes of the allocation formula to which we will later refer, whereby the portion of total net worth taxable in New Jersey is ascertained, we should take note of the particular hour upon which the mergers occurred or deem the mergers to be effec-

tive during the entire day. As to that question, the answer, required by sheer practicality, is that the mergers must be treated as effective for the entire day upon which they were accomplished. The law will not ordinarily concern itself with fractions of a day; the day is deemed to be the single unit of time, unless the statute or the agreement of the parties where it is controlling expressly provides for a different approach. See 52 *Am. Jur., Time*, § 15, *p.* 339; *Loughran v. Jersey City*, 86 *N. J. L.* 442 (*Sup. Ct.* 1914); *Greulich v. Monnin*, 142 *Ohio St.* 113, 50 *N. E.* 2d 310, 149 *A. L. R.* 477 (*Sup. Ct.* 1943).

## II.

We return to the question posed above, whether for the purposes of this tax statute a merger on the last day of a base year may be ignored in determining the tax upon the surviving corporation for the ensuing privilege year.

The Corporation Business Tax Act (1945) was adopted because of dissatisfaction with prior law under which intangible property was taxable *ad valorem* at the substantial rates applicable to realty and tangible personalty. While some owners of intangibles paid at negotiated rates or escaped taxation completely, others were suddenly selected for full taxation, a phenomenon which was dubbed "tax lightning." The Legislature accepted the recommendation in the *Report of the Commission on Taxation of Intangible Property* (1945), *p. xxii,* that the statute be adopted to supersede such taxation of intangibles and as well the then-existing capital stock tax act.

Section 2 accordingly provides that every domestic and foreign corporation, not exempted, shall pay "an annual franchise tax * * * for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office in this State," which "franchise tax shall be in lieu of all other State, county or local taxation

upon or measured by intangible personal property used in business by corporations liable to taxation under this act."

Although the tax in part is thus "in lieu of" *ad valorem* taxation of intangibles, it is not a tax upon any of the underlying property of a corporation. Rather it is a tax for the privilege of the franchise, and the value of that privilege is ascertained on the basis of net worth, it evidencing the potential of the corporation for doing business under the franchise with the sanction and protection of the laws of this State. *Werner Machine Co. v. Director of Division of Taxation*, 17 *N. J.* 121, 127 (1954), affirmed, 350 *U. S.* 492, 76 *S. Ct.* 534, 100 *L. Ed.* 634 (1956); see *Household Finance Corporation v. Director of Division of Taxation*, 36 *N. J.* 353, 358 (1962), appeal dismissed and *cert.* denied, 83 *S. Ct.* 41 (1962). That the tax is not a disguise for a tax upon underlying assets is evident from the rates, which range from 8/10 of a mill upon the first $100,000,000 of allocated net worth to 2/10 of a mill above $300,000,000, and are quite nominal when compared with the prevailing rates of *ad valorem* taxation of tangible property. In short, the Legislature replaced the existing corporate franchise tax with a tax of the same nature, notwithstanding the assessments are upon a different basis with rates revised to pick up some of the revenues which the tax on intangibles had yielded on hit-and-miss enforcement.

The taxes here imposed were not for the privilege of the year past but rather for the privilege to be exercised in the year to follow. This is evident from section 15 quoted above, and as well from section 13 which provides that in the case of a corporation organized or qualified "on or after January first in any year no tax shall be payable in such privilege year," and section 12 which requires payment of the tax for the privilege year in which a corporation dissolves or withdraws from the State. Indeed the failure after the merger to file for the corporations merged into Steel Company can be understood only on the thesis that they had already paid for franchise privileges for 1951 by the tax

theretofore assessed for that year on the basis of net worth as of December 31, 1950.

From these propositions, to wit, (1) that the tax calculated on the basis of net worth at the close of 1951 is for the franchise privilege for the year 1952, and (2) that the tax is measurable by the net worth which gives potential and value to the privilege in 1952, it follows that it would defeat the statutory scheme to accept the fiction that the net worth of the other subsidiaries reached Steel Company at some moment beyond December 31, 1951 notwithstanding that those subsidiaries expired prior to January 1, 1952. Thus to recognize a tax limbo would be to deny the reality that for 1952 the worth of the franchise of Steel Company was fattened by the net worth which it acquired by merger and with which it was about to embark upon the new privilege year.

It of course is immaterial that Steel Company had not reflected the transaction on its books as of December 31, 1951. The Director was not bound by the company's bookkeeping. He could properly conclude the books did not disclose fair valuation of the components of net worth under accounting principles which are sound in the light of this tax statute. See section 4, "net worth."

For the same reasons, the Director correctly held that Steel Corporation absorbed Steel Company on December 31, 1952, and hence its net worth for the purposes of the 1953 tax was the postmerger figure.

## III.

Attack is next made upon the Director's computation of the allocation fraction.

With respect to multi-state activities, the statute prescribed two basic formulas for the allocation to this State of the portion of total net worth to be taxable here, the tax to be measured by the greater of the portions so allocated. Section 5(a) refers to section 6 which employs the so-called Massachusetts formula, a composite of average value of real

and tangible personal property, receipts, and payroll in New Jersey as against the totals thereof everywhere. Section 5(b) utilizes the ratio of the average value of assets in New Jersey to assets everywhere. Section 5(b) is here controlling and we quote it as amended by *L.* 1947, *c.* 50:

"(b) that proportion of its entire net worth as the average value of its total assets in this State during the period covered by its report is to the average value of its total assets everywhere during such period (for the purpose of which there shall be included as within this State all intangible personal property of domestic corporations not having a business situs outside this State, one-half of the value of such property having a business situs outside this State, and the entire amount of the intangible personal property of foreign corporations as would have a business situs within this State for the purpose of a property tax)."

With respect to the tax upon Steel Company for 1952, the amount calculated in the return was $33,198.28. The tax as redetermined by the Director was $68,672.43, upon an allocated net worth of $80,721,856. The increase was due essentially to the inclusion in total net worth of the net worth of the 18 companies merged into Steel Company. The impact of the revision of the allocation fraction was slight. The fraction, expressed in percentage terms, was 6.2805 in the return and 6.3065 upon the redetermination.

Nonetheless, the formula is alleged to be improper because the Director used, as the statute plainly requires, the "average" value of assets throughout the base year. We are not sure we understand what approach the taxpayer would prefer. The taxpayer suggests "There was no fair or reasonable relationship between the net worth being measured and the assets used as the measuring yardstick." The most immediate relationship between the two would be had if consideration were given solely to the assets held on December 31. What the fraction, so determined, would be, we are not told. We know only that the use of average value of assets throughout the base year yields a fraction slightly more unfavorable for the taxpayer than the fraction calculated on the basis of premerger assets alone, from which circumstance we

infer that if consideration were given solely to the assets on December 31, 1951, the taxpayer would likely have fared still more poorly. At any rate the Director's adjustment in the allocation fraction is characterized by the taxpayer as "minor" and such it was. The real complaint is that the total net worth used was postmerger rather than premerger, and upon that separate issue we have already held against the taxpayer.

With respect to the tax against Steel Corporation for the year 1953, the tax as calculated by it was $251,495.66. As redetermined the tax was $305,607.03 upon an allocated net worth in excess of a billion dollars. The increase was due to the use of postmerger net worth instead of the premerger net worth used in the return, and also to the disallowance of a subsidiary deduction claimed with respect to Steel Company. The allocation fraction as redetermined by the Director was actually more favorable than the fraction computed by Steel Corporation in its return. In percentage terms, the return revealed 50.00095609 while the Director, by giving one day's effect to the postmerger assets, arrived at the percentage figure of 49.8511.

The inequity, if any, would here arise from the circumstance that Steel Corporation was a *holding* company for 365 days of the base year 1952 (leap year) and an *operating* company on the last day. As a *holding* company, its stock investment in its subsidiary, Steel Company, was taken into the allocation formula at 50% of book value. On the other hand, if consideration were given solely to the *postmerger* assets, the allocation formula would have yielded a percentage in the neighborhood of 16, rather than 49.8511. Steel Corporation thus urges that since it was entering the privilege year 1953 as an operating company, the allocation of net worth should be made solely on the basis of assets on hand on December 31. The result, of course, would be a tax substantially less than Steel Corporation itself revealed on its own return. We assume that it did not file on the basis we are now discussing because of its preoccupation throughout with the thesis that

the premerger net worth should control. In fact, Steel Corporation did not contend for a tax liability less than that shown on its return. The assault upon the allocation fraction seems to have been a sort of makeweight in support of its primary claim that the mergers be ignored.

At first we were impressed with the seeming incongruity involved in looking to premerger assets of a holding company in the allocation of a postmerger net worth when the company at that stage has the garb or purpose of an operating company. Upon reflection, however, we are satisfied that that circumstance would not warrant a departure from the statutory scheme.

Taxation being, as has been so often observed, an intensely practical matter, the Legislature must adopt an approach which will be administratively feasible. Here the formula in section 5(b) calls for an allocation upon the basis of *average* value of assets in the base year, rather than the value of assets held at year-end. There is nothing invidious in the use of average value. On the contrary, average value is more likely to reflect the true worth of a full year's privilege. To refer only to the asset value as of a single day would be to give decisive effect to the peculiarities of a particular business activity and as well to offer a reward for manipulation. Hence use of the average of asset values in the base year could not be denounced as unreasonable, and no decision is cited which intimates otherwise.

Nor can we say the transformation of a holding company into an operating company so singularly requires special treatment that the Legislature must have intended it. For one thing, changes in direct asset holdings may have as dramatic an impact upon the allocation formula as changes due to absorption of an operating subsidiary. But apart from this, the administrative problems would be substantial if the Director had to explore the intercorporate changes of each complex to determine whether to depart from the formula of section 5(b). The patterns could vary considerably. Here the change occurred on December 31. In another case, the

change or changes, and there could be several, could be effective anywhere within the base year. Or the product of the merger could be a company which operates in part directly and in part through subsidiaries. And, of course, even in the factual pattern of the present case, the surviving company need not remain an operating company throughout the privilege year. We have assembled some of the considerations which could well induce the Legislature to decide against devising a separate approach with respect to intercorporate situations.

The history of the statute indicates affirmatively that the Legislature intended no administrative modification of the formula of section 5(b).

The *Report of the Commission on Taxation of Intangible Personal Property,* to which we have already referred, predicted the tax under section 5(b) would ordinarily be the "minimum measure," *pp.* 62–63. In discussing this average-assets formula, there referred to as "Alternative 2," the *Report* commented (*pp.* 78–79):

> "The proposed Alternative 2 allocation, according to the ratio of assets in the State to total assets, will very infrequently give a higher allocation factor in-State than the three-way formula for the ordinary business corporation. It is intended primarily to provide an adequate replacement base in the case of corporations having relatively large holdings of intangible personal property, but insufficient activity in New Jersey to produce a reasonably substantial base under the tangible property-gross receipts-wages formula of Alternative 1. Such corporations are the most direct beneficiaries of the abandonment of taxation of intangibles upon an *ad valorem* basis, and for this reason justify the alternative formula. The total assets allocation under Alternative 2 will also minimize the possibilities for tax avoidance under Alternative 1 in the case of domestic corporations."

The Commission considered whether discretion should be vested in the taxing authority to depart from the formulas "to prevent unfair or even unconstitutional results in given cases" and concluded "such a provision is necessary under the decisions of the United States Supreme Court" (*p.* 79). In implementing this recommendation the Legislature in section

8 significantly confined the authority of the commissioner (now Director) to adjustments with respect to the three-way formula of section 5(a), adding in unmistakable terms:

"Nothing herein shall be construed to require or permit the commissioner to adjust an allocation factor determined pursuant to section five (b)."

The *Second Report of the Commission on State Tax Policy* (1947) found that section 5(b) "resulted in an undue tax burden upon domestic corporations as compared with foreign corporations" (*p.* 84). The Commission accordingly recommended that section 5(b), which originally took in intangibles at full value, be amended "so as to require domestic corporations owning intangible personal property which has a business situs outside the State to include only 50 percent of such intangibles as assets within New Jersey" (*p.* 89). That recommendation was implemented by *L.* 1947, *c.* 50, amending § 5(b) to read as we quoted it above.

The *Second Report* also considered a proposal that corporations be permitted to file consolidated returns. It rejected the proposal, saying (*p.* 97):

"Use of consolidated returns under the Corporation Business Tax Act would have the effect of grouping two or more corporations and assessing a franchise tax upon their combined net worth after elimination of inter-corporate accounts. The resulting tax would depend upon group holdings and group activity and would not reflect a payment for individual corporate charters or privileges. For large families of corporations such as those controlled by some of New Jersey's holding companies, it would virtually eliminate the tax for corporate privileges exercised by any but the parent corporation. Because consolidation would combine allocation factors as well as balance sheet accounts, it would enable corporate families operating on a national or international basis to escape all but a nominal tax in New Jersey."

The foregoing resume reflects the thought that it behooves the taxpayer to weigh the tax consequences entailed in operations through subsidiaries. The significant fact is that although the Legislature ameliorated the impact of section 5(b)

by permitting a holding company to assign its stock investment to a foreign situs and thereby reduce by 50 percent its role in the allocation formula, as Steel Corporation here did, the Legislature left unchanged its mandate in section 8 that there shall be no departure from section 5(b) because of some supposed inequity in its operation in any particular case.

We could not direct another course unless the statute transcended constitutional limitations. The taxpayer did not tender a constitutional issue as a ground of appeal. The sole reference to that topic first appeared in its reply brief on reargument. At any rate we would find no substance in the charge.

The taxpayer refers to the proposition that a tax formula fair on its face may nonetheless be invalid if it taxes extraterritorial values or activities. *Household Finance Corporation, supra* (36 *N. J.*, at *p.* 362). Assuming a *domestic* corporation may thus assail a tax upon its franchise, see Note, "Federal Limitations on State Taxation of Interstate Business," 75 *Harv. L. Rev.* 953, 1035–36 (1962), we find no basis for the attack.

The most that has been shown is that a tax upon a modification of the statutory formula would be less than upon the formula as written. That hardly proves that the formula *in fact* allocated to New Jersey *any* extraterritorial property or activity, let alone so much as would meet the exacting test of a palpable misapportionment. In short, there is no cogent proof that the privilege is not worth the charge here made for it. See *International Harvester Co. v. Evatt,* 329 *U. S.* 416, 422, 67 *S. Ct.* 444, 91 *L. Ed.* 390, 395 (1947).

Moreover the alleged inequity did not arise from the inexorable application of the statute to the basic business operation itself. Rather the taxpayer had a fair choice of consequences. The mergers could have been accomplished early in January, in which event the alleged inequities would not have appeared. Steel Corporation did not, doubtless for good business reasons, but the Federal Constitution does not demand that a state so frame its laws that a taxpayer may move

at any time with the least possible tax liability. For example, a taxpayer may have excellent reasons, indeed compelling ones, to sell a capital asset one day short of the minimum holding period required for more favorable income-tax treatment, but he could not assail the federal statute as unreasonable on that account. As we said in *Household Finance Corporation, supra* (36 *N. J.*, at *p.* 362), "it is for the taxpayer to make its business decisions in the light of tax statutes, rather than the other way around." True, if the mergers occurred early in the base years, the expiring corporations would not have enjoyed the full year's privilege for which they had paid. Still no inequity would have resulted, let alone one of constitutional size, since, as pointed out earlier, the statute did not exact a privilege tax for the year of incorporation.

## IV.

The final question is whether the Director correctly disallowed a deduction claimed by Steel Corporation for 1953 with respect to its subsidiary capital investment. We agree with the Division of Tax Appeals which said:

"This deduction claimed by petitioner and rejected by respondent is covered by *R. S.* 54:10A–9. Its purpose is to enable a taxpayer to avoid what would otherwise be a double tax, *i. e.*, a tax imposed upon it as well as a tax on its subsidiary (Second Report of the Tax Commission on State Tax Policy (1947) *p.* 53). It provides as follows:

'Any taxpayer which holds capital stock of a subsidiary during all or part of any year may, for the purposes of the tax imposed by this act, deduct from its net worth such proportion of the average value of such holdings less net liabilities (if any) to subsidiaries, as the ratio of the subsidiaries taxable net worth, *for the same year under this act*, to its entire net worth   *   *   *.'

Since United States Steel Company went out of legal existence on December 31, 1952, it had no taxable net worth for the year 1953. Likewise since United States Steel Company paid no tax for the privilege year 1953, United States Steel Corporation should not be allowed a deduction for its capital investment in the Company in that year."

The judgments are accordingly affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, HALL and SCHETTINO—5.

*For reversal*—None.