592 A.2d 536

BENDIX CORPORATION, PLAINTIFF–APPELLANT,
v. DIRECTOR, DIVISION OF TAXATION,
DEFENDANT–RESPONDENT.

Argued January 14, 1991—Decided July 16, 1991.

*Mark S. Rattner* argued the cause for appellant (*Riker, Danzig, Scherer & Hyland,* attorneys, *Mark S. Rattner* and *Paul H. Brownstein,* on the briefs).

*Mary R. Hamill,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney, *Michael R. Clancy,* Assistant Attorney General, of counsel).

*Charles M. Costenbader* submitted a brief on behalf of *amicus curiae* Committee on State Taxation of the Council of State Chambers of Commerce (*Stryker, Tams & Dill,* attorneys, *Paul H. Frankel,* on the brief).

The opinion of the court was delivered by

MUIR, Jr., J.A.D., Temporarily Assigned.

On this appeal, plaintiff, Bendix Corporation, a multi-jurisdictional, non-domiciliary corporation doing business in New Jersey, argues New Jersey transgressed the due process and commerce clause limitations of the United States Constitution when the State taxed capital gains Bendix earned from the sale of all its stock in two corporate affiliates. In 1981, Bendix sold its 20.6% stock ownership in ASARCO Inc., and its 100% stock ownership in United Geophysical Corporation (UGC). New Jersey relied on the unitary business/formula apportionment method to assess the tax on the resulting capital gains and related interest. The assessment resulted in an additional tax liability of $1,845,000, which the State set off against Bendix's 1981 refund. The Tax Court upheld the assessment. The Appellate Division affirmed. We now affirm.

## I.

Bendix filed a complaint in the Tax Court challenging the deficiency assessment that arose from the Director's inclusion of the capital gains realized from the sales and related investment-account interest in the tax base of the apportionment formula employed to calculate Bendix's corporate business tax. The parties presented a stipulated record that included the deposition of W.M. Agee, chief executive officer of Bendix from 1977 to 1983. The Tax Court found no constitutional infringement created by the tax imposition. It ruled Bendix a unitary business, concluding the active investment strategy that led to the capital gains made that intangible income unitary and, therefore, apportionable. The Tax Court reached its conclusion by focusing on the investment activities of Bendix rather than the activities of the corporation's affiliates or their relationship with Bendix. In making its decision, the Tax Court relied in particular on *Container Corp. of America v. Franchise Tax Board,* 463 *U.S.* 159, 103 *S.Ct.* 2933, 77 *L.Ed.*2d 545 (1983), and *Silent Hoist & Crane Co. v. Director, Division of Taxation,* 100 *N.J.* 1, 494 *A.*2d 775, *cert. denied,* 474 *U.S.* 995, 106 *S.Ct.* 409, 88 *L.Ed.*2d 359 (1985). The court also ruled Bendix failed to establish any ground for altering the statutory allocation formula employed.

The Appellate Division affirmed. 237 *N.J.Super.* 328, 568 *A.*2d 59 (1989). While that court did not "fully subscribe" to the legal distinction the Tax Court made between dividends and capital gains and emphasized the factual difference between *Silent Hoist* and this case, *see id.* at 336, 568 *A.*2d 59, it concurred in the Tax Court's recognition of Bendix's commitment "to a corporate strategy of international diversified growth" as a basis for finding Bendix a unitary business. The Appellate Division also affirmed the apportionment formula for the reasons expressed by the Tax Court. Bendix, relying on *R.* 2:2–1(a)(1), appealed to this Court as a matter of right, asserting a substantial question under the United States Constitution.

## A.

Bendix is a Delaware corporation with its principal office in Southfield, Michigan. In 1929, Bendix incorporated in Delaware. At that time it manufactured aviation and automotive parts.

In 1937, Bendix qualified to do business in New Jersey. Its operations in this State essentially consist of the production of several aerospace flight, guidance and test systems in Teterboro and of the manufacture of electric power-generating systems in Eatontown. The specific activities of Bendix in New Jersey are carefully detailed in the Tax Court opinion. 10 N.J.Tax 46 (1988).

Bendix has grown to be a multi-jurisdictional corporation with activities through direct operation or affiliates in all fifty states and twenty-two foreign countries. According to the deposition of Agee, Bendix, from 1965 to 1981, sought to diversify the company's holdings and strengthen its operations. During that period, Bendix acquired either part or all of over forty separate companies. In the same period, Bendix sold off eight or more of its affiliates or divisions, including ASARCO and UGC.

Annual reports to stockholders during the growth period reflect a methodology of selective acquisitions and divestitures of companies to foster corporate expansion in new areas or of existing business activities. The 1969 annual report to shareholders reflects the growth program in the statement, "we intensified our efforts to expand [from businesses dependent on the government sector] in other commercial and industrial markets." The same report states, "[a]cquisitions have played a significant role in the growth of your Corporation during the past decade." The report refers to six corporate acquisitions and four corporate sales during the year.

Each annual report thereafter trumpets Bendix's strategies to pursue diversification and growth in both domestic and foreign markets. By 1975 Bendix had followed a "careful diversification ... into four broad lines of business—automo-

tive, aerospace-electronics, industrial-energy and shelter." Those four lines under Agee's direction changed to automotive, aerospace-electronics, forest products, and industrial-energy, with all affiliates being assigned to one of those four major operating groups. The New Jersey divisions fell essentially into the aerospace-electronics and the industrial-energy groups.

The operating groups served as the basis for vertical corporate supervision. Generally, while each subsidiary had its own management, that management reported to the chief executive of its group. The group chief executive reported to the Bendix CEO, who also served as chairman of the board. In that way, the CEO maintained almost exclusive control and decision-making power over the entire corporation. In his deposition, Agee stated he made the final decision on all acquisitions and divestitures subject to board approval where required.

Bendix maintained a planning department to advise group managers and Agee on "long and short range business proposals." Those proposals analyzed capital commitments to existing as well as new business activities, analyzed divestiture of affiliates or operating units, and evaluated acquisition candidates. As one stipulation put it, "[w]hile acquisition or divestiture was not the sole means of accomplishing certain ... objectives, Bendix ... engaged in selected acquisitions and divestitures of companies or assets over the years."

Agee, in his deposition, described some of the planning department's responsibilities on the strategies of growth. He characterized one of the department's responsibilities as what it takes to grow with and without capital and, if with it, how much more. These strategy reviews dovetailed with Bendix's consideration of group managers' plans for making an acquisition "in order to remain competitive" or with the general corporate goal of expansion within the existing financial base or one entailing the "need [for] more money." The record discloses evidence from which one can reasonably conclude that

such acquisition decisions entailed reliance on the cash flow from divestitures as a source of capital.

By 1977, under Agee's hand, diversification and expansion had become the by-word of corporate policy. The 1977 annual report states, "we have pursued a deliberate policy of diversification both within and among our lines of business, and geographically as well, in an effort to arrive at a combination of activities that helps insulate the company as a whole from the ups and downs of any one of them."

This theme in 1978 fostered a memorandum from Agee to Bendix's planning committee entitled *Long Range Growth and Acquisition Planning.* For the 1980s, the memorandum recommended diversification in several areas to encourage corporate growth, "rebalancing," and restructuring of a Bendix division with an eye to divestiture. The memorandum discusses the effect acquisitions would have on "near-term earnings" and notes "[e]ach major acquisition would be structured to leave us positioned financially to take the next action."

The 1978 memorandum specifically discusses several acquisitions required for "strong growth in the 80's." One of those acquisitions was ASARCO.

### B.

ASARCO's appeal to Bendix stemmed from ASARCO's profitable natural resource business, some of which occurred in New Jersey. The specific nature and extent of that business is described in *ASARCO Inc. v. Idaho State Tax Commission,* 458 *U.S.* 307, 102 *S.Ct.* 3103, 73 *L.Ed.*2d 787 (1982).

Agee's 1978 memorandum targeted ASARCO for acquisition. The memorandum reviewed the alternatives between total acquisition and 20% stock ownership. Agee opined that, even with a minority stock ownership, Bendix's influence would be "felt" with one or two seats on ASARCO's board of directors. Agee projected the minority membership would give Bendix

"access to insider information which could inhibit but not bar further acquisition of shares."

By November 1978 Bendix owned 20.6% of ASARCO's stock. Bendix gained two seats on ASARCO's board in the persons of Agee and an outside director of Bendix. While an agreement negotiated with ASARCO placed limits on Bendix's ability to acquire more stock and despite the absence of further stock acquisitions, Bendix benefited significantly from its minority ownership. In 1979, ASARCO contributed 82¢ per share to Bendix's total earnings of $7.10 per share. In 1980, ASARCO contributed $2.22 per share to Bendix's total earnings of $7.68 per share.

During the time Bendix owned 20.6% of ASARCO, the companies had limited interaction. They shared no common officers, employees, office space, or legal services. Neither company loaned money to the other nor did either guarantee debts of the other. Also, while ASARCO subsidiaries made small arms length sales to Bendix, the companies did not make direct sales to one another. Bendix kept ASARCO's activities under review through a quarterly examination of ASARCO's books and continuous scrutiny of ASARCO's earnings by Bendix's board of directors.

In October 1980, ASARCO agreed to purchase the Bendix shares. The purchase occurred in 1981, yielding a capital gain of approximately $211,500,000. According to Agee, Bendix sold the ASARCO stock as part of its plan for restructuring the company. Agee characterized the restructuring as an effort to move into the high technology field to make the entire company less dependent on the automobile business for profits and to sell off those aspects of the corporation that did not financially or otherwise fit the "mainstream" mold Bendix's decision makers sought. Agee projected the move into the high technology field as an opportunity to benefit and complement Bendix's New Jersey operations. Bendix placed the proceeds of the

stock sale in a Lehman Brothers investment account comming-ling them with the UGC capital gain proceeds.

C.

Bendix had purchased 100% of UGC in 1965 as part of its acquisition program. The 1965 annual report to Bendix stock-holders identifies the purchase as one beyond "[mere] diversifi-cation" and part of the enhancement and improvement of Bendix's competence in geophysical services to oil companies. UGC performs seismic surveying to locate oil and natural gas sources with none of the business conducted in New Jersey.

Bendix had selective integration or unity with UGC. Bendix made one of its corporate officers, Murray Weingarten, presi-dent of UGC for a four-year period. Weingarten reorganized UGC and placed two other Bendix employees in management positions. Weingarten reported regularly to Bendix superiors. After Bendix reassigned Weingarten, the president of UGC continued to report regularly to a Bendix corporate executive and group manager. During Bendix's ownership of UGC, the subsidiary had sixteen directors and thirteen officers with simultaneous or prior employment at Bendix. However, the companies did not share patents or technology nor did they sell goods to one another. They had separate pension plans, sepa-rate personnel manuals, and did not engage in centralized purchasing or banking. UGC also did not provide services to Bendix.

Management integration occurred in other significant areas. Bendix approved Weingarten's hiring and salary decisions. Bendix also approved UGC's annual financial and strategic plans, approved capital expenditures above certain dollar limits, and kept abreast of UGC's activities through periodic reports, joint management conferences, and regular eighteen-month au-dits. Bendix's management control also resulted in a veto of a UGC effort to end its marine exploration program.

Other less significant integration occurred. Bendix guaranteed UGC's California workers' compensation plan, while UGC employees participated in Bendix's workers' compensation plans as well as certain employee savings and stock ownership plans. Bendix also provided some insurance, legal, and tax advice services for compensation.

Financially, Bendix also provided assistance to UGC. The parent company financed the construction of two $1,000,000 seismic exploration ships, made periodic working capital loans at market interest rates, and capitalized $11,100,000 of UGC debt to Bendix in 1978 and 1981, which eliminated UGC's fixed obligation to repay the debt.

The UGC divestiture occurred in July 1981. Reasoned essentially on the same grounds as the ASARCO divestiture, Bendix made a capital gain of approximately $41,900,000, the proceeds of which it deposited in the Lehman Brothers investment account.

## D.

The capital gains proceeds from the ASARCO and UGC stock sales did not lie idle long. After earning approximately $3,400,-000 in interest, Bendix used the proceeds for essentially two purposes—to repurchase 4,000,000 shares of outstanding Bendix stock and to contribute to the acquisition of 70% of Martin Marietta's stock.

The 1981 annual report described corporate ventures made possible by the divestiture-generated capital gains. Characterizing the ventures as "ambitious aspirations for the future," the report states:

[O]ur redeployment of assets through our divestment program also contributed significantly to net income in 1981. We completed our plan for major divestments with the sales of [ASARCO and UGC].

These major strategic actions converted approximately $500 million in lower-return assets into a liquid portfolio....

In addition, the effective execution of this asset redeployment program generated approximately $275 million in net gains.... These gains allowed [repur-

chase of] some four million shares ... which should enhance future shareholder value.

. . . .

We have the capability to expand or restructure our businesses through acquisitions and other investments. A three-pronged acquisition program is well under way....

[The second prong is] [r]esources will be available on a continuing basis to *finance natural extensions of our existing businesses.*

[The third prong is] directed toward major businesses which could provide additional dimensions to the company. [emphasis added]

Agee indicated the investment or acquisition program was foremost in his mind. Asserting he made the decision to acquire Martin Marietta, Agee stated that Martin Marietta fit "very nicely" into the financial and operational strategies of the company. He described the Martin Marietta acquisition as "very complementary and compatible with Bendix." He noted Martin Marietta was a prime contractor in many cases, and Bendix was a subcontractor. That, he reasoned, made "a lot of our technology and management philosophies and businesses ... complementary to one another."

Agee submitted a report to the Bendix board on the proposed acquisition of Martin Marietta. In that report Agee wrote:

[O]ur commitment to the aerospace industry would be deepened [with the acquisition], strengthening our reputation as a reliable supplier to this nation's defense and that of its allies....

The combined company would be stronger financially, with about double Bendix's current profits and assets.

Bendix went forward with its purchase of 70% of the stock of Martin Marietta, but before Bendix could arrange a Martin Marietta stockholders meeting to complete the takeover, maneuvering by other corporations interfered with Agee's dream. Martin Marietta and Allied Signal bought up Bendix stock, which resulted in Bendix becoming a wholly owned subsidiary of Allied Signal.

## II.

The unitary business/formula apportionment method has evolved as a constitutionally acceptable standard for resolving

the problem of State taxation of multi-jurisdictional corporations doing business in the taxing State. *See Container Corp. of Am. v. Franchise Tax Bd., supra,* 463 *U.S.* at 165, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 553. The method

> calculates the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction. [*Id.*]

The unitary business principle, characterized as the "linchpin of apportionability," provides the foundation to satisfy due process and commerce clause restraints. *See Mobil Oil Corp. v. Commissioner of Taxes,* 445 *U.S.* 425, 439, 100 *S.Ct.* 1223, 1232, 63 *L.Ed.*2d 510, 522 (1980).

■   The due process and commerce clauses impose two restrictions on the authority of a State to tax income spawned by business activities of multi-jurisdictional corporations. First, there must be "a 'minimal connection' between the interstate activities and the taxing State." *See id.* at 436–37, 100 *S.Ct.* at 1231–32, 63 *L.Ed.*2d at 520 (quoting *Moorman Mfg. Co. v. Bair,* 437 *U.S.* 267, 273, 98 *S.Ct.* 2340, 2344, 57 *L.Ed.*2d 197, 204 (1978)). Second, there must be a rational relationship between the income attributed to the State for tax purposes and the intrastate values of the corporate business. *See id.,* 445 *U.S.* at 437, 100 *S.Ct.* at 1231, 63 *L.Ed.*2d at 520. In other words, if the taxing State has some tie with the corporation's interstate business and it taxes only so much of the corporate income as bears a rational relation to activities the corporation conducts in the taxing State, the tax imposed comports with constitutional restraints.

Under the unitary business principle, the minimal contacts restraint is met if a multi-jurisdictional corporation is found to be a unitary business. The principle is that so long as a multi-jurisdictional corporation's "intrastate and extrastate activities form[ ] part of a single unitary business," the required minimum contacts exist that entitle the taxing State to an appor-

tioned share of all the corporation's income. *See id.* at 438, 100 *S.Ct.* at 1232, 63 *L.Ed.*2d at 521.

While the principle can be stated with ease, defining the scope of a unitary business is not as readily done. A series of United States Supreme Court opinions has shaped the defining process. *See Container Corp. of Am. v. Franchise Tax Bd., supra,* 463 *U.S.* 159, 103 *S.Ct.* 2933, 77 *L.Ed.*2d 545; *F.W. Woolworth Co. v. Taxation & Revenue Dep't,* 458 *U.S.* 354, 102 *S.Ct.* 3128, 73 *L.Ed.*2d 819 (1982); *ASARCO Inc. v. Idaho State Tax Comm'n, supra,* 458 *U.S.* 307, 102 *S.Ct.* 3103, 73 *L.Ed.*2d 787; *Exxon Corp. v. Wisconsin Dep't of Revenue,* 447 *U.S.* 207, 100 *S.Ct.* 2109, 65 *L.Ed.*2d 66 (1980); *Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 *U.S.* 425, 100 *S.Ct.* 1223, 63 *L.Ed.*2d 510; *Moorman Mfg. Co. v. Bair, supra,* 437 *U.S.* 267, 98 *S.Ct.* 2340, 57 *L.Ed.*2d 197; *Butler Bros. v. McColgan,* 315 *U.S.* 501, 62 *S.Ct.* 701, 86 *L.Ed.* 991 (1942); *Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell,* 283 *U.S.* 123, 51 *S.Ct.* 385, 75 *L.Ed.* 879 (1931); *Bass, Ratcliff, & Gretton, Ltd. v. State Tax Comm'n,* 266 *U.S.* 271, 45 *S.Ct.* 82, 69 *L.Ed.* 282 (1924); *Underwood Typewriter Co. v. Chamberlain,* 254 *U.S.* 113, 41 *S.Ct.* 45, 65 *L.Ed.* 165 (1920); *Adams Express Co. v. Ohio State Auditor,* 165 *U.S.* 194, 17 *S.Ct.* 305, 41 *L.Ed.* 683 (1897). In *Silent Hoist & Crane Co. v. Director, Division of Taxation, supra,* 100 *N.J.* 1, 494 *A.*2d 775, we thoroughly analyzed the scope of the holdings of those cases, and we need not repeat that analysis here. What bears repeating is the tenor of those holdings.

To begin with, substance not form dictates whether a unitary business exists. We must look at the underlying activities, the economic realities of the corporation, not the form in which the income is received or other vagaries of formalism. *See Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 *U.S.* at 440–41, 100 *S.Ct.* at 1233–34, 63 *L.Ed.*2d at 522–23. Those dictates make resolving the issue of whether a unitary business exists fact sensitive. As the Supreme Court noted in *ASARCO,* "these cases are decided on their facts in light of established

general principles." 458 *U.S.* at 329 n. 24, 102 S.Ct. at 3116 n. 24, 73 *L.Ed.*2d at 803 n. 24.

The focus on facts or underlying activities and avoidance of reliance on form to determine the existence of a unitary business is necessary because of the intangible nature of corporate activities. As noted in *Exxon*, reliance on a particular form, in that case an accounting method, for resolving the issue may not comport with the facts a State needs when it "seeks to tax values created by business within its borders." 447 *U.S.* at 222, 100 *S.Ct.* at 2119, 65 *L.Ed.*2d at 80 (quoting *Butler Bros. v. McColgan, supra,* 315 *U.S.* at 507, 62 *S.Ct.* at 704, 86 *L.Ed.* at 996). That is so because a

State in attempting to place upon a business extending into several States "its fair share of the burden of taxation" is "faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders." [*Id.* (quoting *Underwood Typewriter Co. v. Chamberlain, supra,* 254 *U.S.* at 121, 41 *S.Ct.* at 47, 65 *L.Ed.* at 169).]

Consequently, the underlying economic realities as evidenced by the facts become the laser beam for resolving the unitary business issue. *See Container Corp. of Am. v. Franchise Tax Bd., supra,* 463 *U.S.* at 179–80, 103 *S.Ct.* at 2947–48, 77 *L.Ed.*2d at 562.

Consonant with the premise that the facts of each case govern is the Supreme Court's refusal to promulgate an exclusive test to evaluate whether a multi-jurisdictional corporation engages in a unitary business. The Court has steadfastly rejected any *per se* or bright line standard for defining a unitary business. *See id.* at 168, 178, 103 *S.Ct.* at 2941, 2947, 77 *L.Ed.*2d at 555, 561; *Exxon Corp. v. Wisconsin Dep't of Revenue, supra,* 447 *U.S.* at 221–22, 100 *S.Ct.* at 2119–20, 65 *L.Ed.*2d at 80; *Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 *U.S.* at 438–42, 100 *S.Ct.* at 1232–34, 63 *L.Ed.*2d at 521–24. As we stated in *Silent Hoist,* there is no single test for defining a unitary business. 100 *N.J.* at 18, 494 *A.*2d 775. Instead, there are a number of nonexclusive tests utilized to determine the existence of a unitary business.

34

Those tests concentrate on the intangible nature of a conglomerate's business activities that contribute to corporate income. In recognition of the fact that corporate income and profitability arise from the operation of a business as a whole, *see Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 *U.S.* at 438, 100 *S.Ct.* at 1232, 63 *L.Ed.*2d at 521, the existence of exchange or transfer of value has become the predicate for satisfaction of constitutional restraints. Justice Brennan, writing for the majority in *Container,* after identifying the principles required to satisfy due process and commerce clause restraints, explained:

> [T]he principles we have quoted require that the out-of-state activities of the purported "unitary business" be related in some concrete way to the in-state activities. The functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation—which renders formula apportionment a reasonable method of taxation. [463 *U.S.* at 166, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 554.]

Prior to *Container,* "unquantifiable transfers of value" emerged in circumstances in which corporate activities involved functional integration, centralization of management, and economies of scale. *See id.* at 164–65, 103 *S.Ct.* at 2939–40, 77 *L.Ed.*2d at 553. *See generally Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 *U.S.* at 438–39, 100 *S.Ct.* at 1232–33, 63 *L.Ed.*2d at 521; *Butler Bros. v. McColgan, supra,* 315 *U.S.* at 508–09, 62 *S.Ct.* at 704–705, 86 *L.Ed.* at 996–97. Thus, the context for determining whether a unitary business exists has, as an overriding consideration, the exchange or transfer of value, which may be evidenced by functional integration, centralization of management, and economies of scale.

■ In applying the tests the Supreme Court has concentrated on the relationship between the multi-jurisdictional taxpayer parent and the affiliate when the latter pays to the parent, usually in the form of dividends, the income that is subjected to a State's apportionment tax. That concentration is pertinent here concerning UGC.

UGC was in a unitary relationship with Bendix. Bendix provided a president, other management personnel, and corporate directors from its ranks. That filling of personnel needs reflects a unitary relationship. Bendix controlled certain hiring and salary decisions of UGC's president. The president reported directly and regularly to executive and management personnel in charge of the Bendix group covering UGC's business activities. That, along with the veto of UGC's effort to terminate its marine exploration program, evidence a supervisory role exemplifying a functionally integrated enterprise illustrative of a unitary business. *See Container Corp. of Am. v. Franchise Tax Bd., supra,* 463 *U.S.* at 179, 103 *S.Ct.* at 2947, 77 *L.Ed.*2d at 562.

Other evidence of a unitary relationship exists. Bendix participated in UGC financial matters, which went well beyond the occasional supervision described in *F.W. Woolworth.* Bendix approved annual financial plans and expenditures over a certain dollar amount, financed ship construction, and capitalized an $11,100,000 debt that eliminated UGC's fixed obligation to repay the debt. Such conduct reflects a "flow of value" that evidences a unitary relationship.

Other Bendix activities existed that, when combined with the foregoing, suggest a unitary business. UGC employees had workers' compensation coverage under Bendix plans, as well as participation in employee savings plans. Bendix provided technical assistance, although for compensation, in the insurance, legal, and tax fields. While such activities alone may not rise to the level of proof of a unitary business, in context with Bendix's functional and personnel integration with UGC, they lead to the conclusion that a unitary business existed.

The tests for determining a unitary business are not controlled, however, by the relationship between the taxpayer recipient and the affiliate generator of the income that becomes the subject of State tax. As has been emphasized, there is no bright line controlling test. What controls is the underlying

activities that reflect the economic realities of the corporate business. In that perspective, the intangible nature of corporate operations is assessed to determine the existence of a unitary business.

From that perspective, we are satisfied the capital gains from the sale of stock in both UGC and ASARCO are apportionable under the unitary business principle. Bendix had an ingrained acquisition-divestiture policy designed to expand and enhance its existing operations as well as to move it into other fields of business. The long-term planning strategy encompassed a process focused on acquisitions, disposition of unwanted affiliates or divisions, and development of sources of capital for new acquisitions. The divestitures served at times as the capital sources for acquisitions. The strategy went well beyond the passive investments in business enterprises referenced in *Container* that are distinct from the corporation's main line of business and that have the sole primary function of diversifying the corporate portfolio and reducing risks inherent in being tied to one industry's business cycle. *See id.* at 178, 103 *S.Ct.* at 2947, 77 *L.Ed.*2d at 561. Bendix, during the period under review, essentially had a business function of corporate acquisitions and divestitures that was an integral operational activity. That function went well beyond the nature of the investment processes in *ASARCO* and *F.W. Woolworth* that the Supreme Court found so wanting in unitary business characteristics. The investment policy did more than simply earn money to continue operations and provide a return on its capital. That is indicated, in part, by the 1981 annual report, which when referencing the capital gains from the ASARCO and UGC stock sales states those sales provided the "liquid portfolio" and provided the resource to finance "natural extensions of Bendix's existing business." That those sales were more than occasional events is mirrored by the long-term policy of continued acquisitions and divestitures, with the latter serving as a means to make the former.

■ When capital investment activities are long-term integral operational corporate functions rather than passive investment functions, they can serve as the basis for concluding a unitary business exists. *Cf. Container Corp. of Am. v. Franchise Tax Bd., supra,* 463 *U.S.* at 180 n. 19, 103 *S.Ct.* at 2948 n. 19, 77 *L.Ed.*2d at 562 n. 19 (citing *Corn Products Ref. Co. v. Commissioner,* 350 *U.S.* 46, 50–53, 76 *S.Ct.* 20, 23–25, 100 *L.Ed.* 29, 34–36 (1955)). In *Corn Products,* the Supreme Court held that income gains and losses that resulted from a corn products manufacturer's purchase of and sale of corn futures constituted ordinary income rather than capital gains for tax purposes. While the ruling arose in another context, we read it as support for the conclusion we reach today.

■ When the investments in affiliates that generate capital gains become an integral part of a corporation's business, such that they go beyond the passive corporate investment and have as their goals the growth and expansion of existing corporate business activities rather than just the providing of return on capital, a basis is established for making the income from those capital gains subject to a State's apportionable tax formula. *Cf. Silent Hoist & Crane Co. v. Director, Div. of Taxation, supra,* 100 *N.J.* at 21–22, 494 *A.*2d 775. Such an investment policy reflects an ordinary business practice that goes beyond the focus on the distinct nature of the affiliate's business and beyond the focus on the existence of a functional relationship or managerial relationship between the taxpayer and the affiliate. *See generally* Hellerstein, *State Income Taxation of Multijurisdictional Corporations and the Supreme Court,* 35 Nat'l Tax J. 401, 417 (1982). It is a policy that involves more than the concept argued by the taxing State in *ASARCO,* and found so wanting by the Supreme Court, that any intangible income should make a business unitary if it is acquired for "purposes relating or contributing to the taxpayer's business." *See AS-ARCO Inc. v. Idaho State Tax Comm'n, supra,* 458 *U.S.* at 326, 102 *S.Ct.* at 3114, 73 *L.Ed.*2d at 801. It is also a policy that creates the nexus and rational relationship required to

satisfy constitutional restraints. *See Container Corp. of Am. v. Franchise Tax Bd., supra,* 463 *U.S.* at 165, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 553.

Some of the evidence required to satisfy those constitutional restraints came from Agee's deposition testimony. Agee testified that the purpose of acquiring Martin Marietta was to complement the aerospace-electronics facets of Bendix business, some of which are located in New Jersey. Agee foresaw the complement in the fact that Martin Marietta's dominance in the aerospace field would enhance the theretofore subordinate or limited activity of Bendix in that field. While the nature of that complement is intangible, it suggests a flow of value analogous to, although different in focus from, that recognized in *Container* for finding a unitary business. *Cf. id.* at 166, 103 *S.Ct.* at 2940, 77 *L.Ed.*2d at 554.

Even though the Martin Marietta takeover never came to fruition, the fact that it served as a goal for part of the capital generated by the sales of ASARCO and UGC stock nurtures the premise that Bendix's ingrained policy of acquisitions and divestitures projected the existence of a unitary business. The nature of that policy as effectuated demonstrates the presence of a unitary business. The policy also precludes Bendix from meeting its "distinct burden of showing by 'clear and cogent evidence' that [the State tax] results in extraterritorial values being taxed." *Exxon Corp. v. Wisconsin Dep't of Revenue, supra,* 447 *U.S.* at 221, 100 *S.Ct.* at 2119, 65 *L.Ed.*2d at 80.

Contrary to Bendix's assertion, the holdings of *ASARCO* and *F.W. Woolworth* do not dictate a reversal of the decision of the Appellate Division. Both *ASARCO* and *F.W. Woolworth* are factually distinguishable. ASARCO's stock investments were "not integral to nor a necessary part of [ASARCO's] business operation." *ASARCO Inc. v. Idaho State Tax Comm'n, supra,* 458 *U.S.* at 324 n. 21, 102 *S.Ct.* at 3113 n. 21, 73 *L.Ed.*2d at 800 n. 21 (quoting the jurisdictional statement). Also, ASARCO did not use "its stock as security for borrowing of working

capital [to] acquir[e] stock or securities in other companies."
*Id.* Beyond that, neither *ASARCO* nor *F.W. Woolworth* in-
volved the purchase of 4,000,000 shares of outstanding corpo-
rate stock to enhance the stockholder value in the corporation.
Also, in neither *ASARCO* nor *F.W. Woolworth* did the taxing
State produce any facts that demonstrated the minimal contacts
and rational relationships required to satisfy constitutional re-
straints. Those differences preclude *ASARCO* and *F.W. Wool-
worth* from controlling here.

In sum, all the capital gains here are income derived from an
activity that is integrally related to the conduct of a unitary
business. Consequently, it is unitary business income that is
subject to apportionment. Moreover, the UGC capital gains are
income derived from an asset that is integrally related to a
unitary business and similarly taxable. The economic realities
of Bendix's corporate activity demonstrate New Jersey's appor-
tioned tax on the capital gains and related interest satisfy all
constitutional restraints.

### III.

We turn now to Bendix's alternative argument that "an
adjustment to Bendix's allocation factor is required" pursuant
to *N.J.S.A.* 54:10A–8. Bendix contends that we should require
the Director to modify the apportionment formula to include the
property, sales, and payrolls of ASARCO and UGC to the
extent of Bendix's percentage of stock ownership in those
companies. *See Silent Hoist & Crane Co. v. Director, Div. of
Taxation, supra,* 100 *N.J.* at 11–14, 494 *A.*2d 775 (explaining
New Jersey's tax apportionment formula).

Bendix's principal argument is that "[a]part from constitu-
tional considerations," the Director abused his discretion in
denying Bendix's request for an adjustment to its allocation
factor under *N.J.S.A.* 54:10A–8. We do not view that to be a
substantial constitutional issue for which *R.* 2:2–1(a)(1) affords
a right of appeal to this Court. *See Piscataway Assocs. v.*

*Township of Piscataway*, 73 *N.J.* 546, 549, 376 *A.*2d 527 (1977). Therefore, we decline to consider that argument.

■ To the extent Bendix suggests an issue of constitutional dimension, we conclude, as did the Tax Court and Appellate Division, Bendix failed to meet its burden of proof. Bendix argues the apportionment formula utilized does not actually reflect a reasonable sense of how the income was generated, relying on *Container, supra*, 463 *U.S.* at 169, 103 *S.Ct.* at 2942, 77 *L.Ed.*2d at 556. Bendix, however, made no actual demonstration of unfairness and instead relied upon notional assertions. As we stated in *United States Steel Corp. v. Director, Division of Taxation*, 38 *N.J.* 533, 547, 186 *A.*2d 266 (1962):

> The most that has been shown is that a tax upon a modification of the statutory formula would be less than upon the formula as written. That hardly proves that the formula *in fact* allocated to New Jersey *any* extraterritorial property or activity, let alone so much as would meet the exacting test of a palpable misapportionment.

■ We are required to strike down an apportionment formula only when the taxpayer establishes by clear and cogent evidence that there is no rational relationship between the income attributed to the State and the intrastate values of the corporation by proving that the apportioned income is out of all appropriate proportion to the business the taxpayer transacts in the State. *See Container Corp. of Am. v. Franchise Tax Bd., supra*, 463 *U.S.* at 170, 180–81, 103 *S.Ct.* at 2942, 2948–49, 77 *L.Ed.*2d at 556, 563. We are not required to disturb an apportionment formula so long as the State, in applying the formula to a unitary business taxpayer's total income, obtains a " 'rough approximation' of the corporate income that is 'reasonably related to the activities conducted within the taxing State.' " *See Exxon Corp. v. Wisconsin Dep't of Revenue, supra*, 447 *U.S.* at 223, 100 *S.Ct.* at 2120, 65 *L.Ed.*2d at 81 (quoting *Moorman Mfg. Co. v. Bair, supra*, 437 *U.S.* at 273, 98 *S.Ct.* at 2344, 57 *L.Ed.*2d at 204). We find no evidence in the record to establish the required distortions or absence of reasonable relationship. Bendix has not sustained its burden of proof.

## IV.

We would be remiss were we not to make one final observation. Cases of this nature are the quintessential example of the tenet that facts, not principles of law, decide cases. *See Feldman v. Lederle Laboratories,* 97 *N.J.* 429, 455, 479 *A.*2d 374 (1984) (citing *Konrad v. Anheuser–Busch, Inc.,* 48 *N.J.Super.* 386, 388, 137 *A.*2d 633 (Law Div.1958)). Our decision today should not be read beyond the scope of the facts of the case.

Affirmed.

*For affirmance*—Chief Justice WILENTZ, CLIFFORD, HANDLER, O'HERN and STEIN, and Judges MUIR and COHEN (temporarily assigned)—7.

*Opposed*—None.